IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Safari Circuits, Inc., )
)
         Plaintiff, )
)
   v. ) 05 C 6736
)
Chicago School Reform Board of )
Trustees, et al., )
)
         Defendants. )

## MEMORANDUM OPINION AND ORDER

Safari Circuits, Inc. ("Safari") brings a breach of contract claim against the Chicago Board of Education ("Board")in this diversity action. Safari was a subcontractor to Systems Concepts, Inc. ("Systems") under a contract between Systems and Board ("Systems Contract") that called for Systems to provide and install audiovisual equipment for Board facilities ("Installation Project"). Safari claims that as a subcontractor on the Installation Project it was a third-party beneficiary of the Systems Contract and that Board breached that agreement when it failed to obtain a payment bond from Systems for the benefit of any subcontractors as required by the Illinois Public Construction Bond Act ("Bond Act," 30 ILCS 550/0.01 to 550/3).[1]

Safari and Board have now brought cross-motions for summary judgment under Fed.R.Civ.P. ("Rule") 56. As this opinion

---

[1] Citations to that statute will take the form "Bond Act §--, omitting the prefatory "30 ILCS 550/."

explains, the Bond Act does not apply because the Systems Contract was not a contract for "public work." Hence no payment bond was required, so that Safari's motion is denied and Board's motion is granted.

### Standard of Review

Under familiar Rule 56 principles, a movant for summary judgment bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)). Ultimately summary judgment is appropriate only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

One more complexity is added here, where cross-motions for summary judgment are involved. In this case those same principles require the adoption of a dual perspective that this Court has sometimes referred to as Janus-like: As to each motion

the nonmovant's version of any disputed facts must be credited.[2]

Finally, as a federal court sitting in diversity, this Court is charged with applying state law -- in this instance Illinois law -- to resolve all substantive questions (<u>M.T. Bonk Co. v. Milton Bradley Co.</u>, 945 F.2d 1404, 1407 (7th Cir. 1991)). What follows then, is (1) a summary of the facts that either are undisputed or are viewed in the light most favorable to Safari (as the party that has ultimately come up short), followed by (2) an application of Illinois substantive law to those facts.

## Background

After issuing a May 2000 request for proposals, Board selected Systems to provide the Installation Project (S. St. ¶¶6-7). Systems was to design, deliver and install a multimillion dollar digital audiovisual system to allow Board to store digital media content on servers at its Central Office and to allow teachers then to download that content directly to computers in their classrooms at some 182 different schools (<u>id</u>. ¶¶8, 58-63). That system would eliminate the teachers' need to check out and transport physical equipment such as DVD players and DVDs from a central library (<u>id.</u>). As this brief summary indicates, that

---

[2] This District Court's LR 56.1 implements Rule 56 by requiring the submission of evidentiary statements and responses to such statements to highlight which facts are in dispute and which are not. This opinion will cite Safari's and Board's respective LR 56.1 statements as "S. St. ¶--" and "B. St. ¶--," and their responsive statements as "S. Resp. St. ¶--" and "B. Resp. St. ¶--."

project was no small endeavor.

In October 2003 Safari agreed to provide Systems with various audiovisual network products and services required for the Installation Project (S. St. ¶8). To meet Board's specific requirements Safari spent months in specially designing and manufacturing some 200 hardware components known as "ASC300s," "multiplexers" or "multiplexer interfaces," as well as some other equipment to be installed at the Central Office and the various schools (id. ¶¶22-27). Systems was also required to program and configure all of the necessary computer hardware (id. ¶34).

Before undertaking the installation itself, Systems personnel visited each site to assess whether the school's facilities were ready to accept and interface with the equipment (S. St. ¶¶37-38). For example, before some of the schools would be ready work was required to install additional wall outlets. All of that work, however, was performed by Board personnel and not by Systems or Safari as part of the Installation Project (B. St. ¶39).[3]

Once the time for installation came, Systems and Safari installed "an interconnected series of eight computer servers, four DVD\VCR units, various audio and video output devices,

---

[3]Safari's apparent attempt to contest that point is unavailing because the testimony it cites does not create any suggestion that anyone other than Board personnel did that preparatory work (see, e.g., S. St. ¶¶39,40; S. Resp. St. ¶39; B. Resp. St. ¶¶39, 40).

-4-

various cables, and four ASC3000s" at the Central Office ("Central Office Equipment")(S. St. ¶29). That Central Office Equipment was then connected to Board's wide-area network ("Network") by a series of 36-foot patch cables that were also attached to a metal rack running along the ceiling to keep them tidy and out of the way (id. ¶33). At each of the schools Systems installed a server, a DVDNCR unit, an ASC3000, a monitor, an uninterruptible power supply and associated cables to connect those components (id. ¶35.) Most of that equipment was mounted onto large racks by screws or otherwise, and the racks were in turn bolted to the floor to prevent tipping (id. ¶¶51-52). In about a dozen of the 182 schools involved, Systems needed to install new racks that it provided and assembled for the Installation Project (id. ¶¶55-57).

All of that installation work at the Central Office and some 182 schools took weeks to accomplish (S. St. ¶45). Then after installation a Safari employee visited each of the schools to connect the equipment to the Schools' Networks with patch cables and to test for the proper functioning of the equipment, including checking the connections between computers and servers in 8,100 classrooms (id. ¶¶46, 49). Safari then conducted training sessions on the use of the new equipment for Board personnel (id. ¶47).

Even though Systems received payment for its work on the Installation Project, it became insolvent and has not in turn

compensated Safari for its work (S. St. ¶16). This Court has already entered judgment against Systems in Safari's favor in the amount of $691,404.91, but the uncertainty of recovery on that judgment in light of Systems' financial condition (id.) understandably leads Safari to look to Board. And because Board did not require Systems to post a payment bond as part of the Systems Contract for the benefit of subcontractors on the Installation Project (id. ¶19), Safari is out of luck in that regard as well. Safari thus brings this action seeking compensation directly from Board for breach of contract.

### "Public Work"

Safari's claim for relief stands or falls on whether it may come within the protections of Bond Act §1, which establishes this requirement with immaterial exceptions:

> [A]ll officials, boards, commissions or agents of this State, or of any political subdivision thereof in making contracts for public work of any kind costing over $5,000 to be performed for the State, or a political subdivision thereof shall require every contractor for the work to furnish, supply and deliver a bond to the State, or to the political subdivision thereof entering into the contract, as the case may be, with good and sufficient sureties. The amount of the bond shall be fixed by the officials, boards, commissions, commissioners or agents, and the bond, among other conditions, shall be conditioned for the completion of the contract, for the payment of material used in the work and for all labor performed in the work, whether by subcontractor or otherwise.

Both Illinois courts and our Court of Appeals (applying Illinois law) have held that the bond posting requirement, read into each applicable contract, is intended by the General Assembly to

benefit a prime contractor's subcontractors directly by providing them an assurance of payment for the work they perform (Ardon Elec. Co. v. Winterset Constr.,Inc., 354 Ill.App.3d 28, 38-39, 820 N.E.2d 21, 30-31 (4th Dist. 2004); A.E.I. Music Network, Inc.,v. Business Computers, Inc., 290 F.3d 952, 955 (7th Cir. 2002)).  That being so, a subcontractor is a third-party beneficiary of the underlying contract and may sue the public entity for breach when that entity fails to obtain the required payment bond (id.)  And that, of course, is exactly Safari's claim.

As the parties here recognize, the rub lies in the fact that the Bond Act §1 requirement does not apply to every contract entered into by an Illinois public entity, but only to "contracts for public work" valued at more than $5,000 (see State ex rel. Chemco Indus., Inc. v. Employers Mut. Cas. Co., 303 Ill.App.3d 898, 903, 708 N.E.2d 1224, 1227 (4th Dist. 1999)).  Hence the question is whether or not the Systems Contract was one for "public work."  If so Safari's claim will succeed, and Board may have to pay a second time for the work provided by Safari even though it has already paid Systems for that same work.  But if no "public work" was involved, Board will not face the risk of double payment, and Safari may be left with a judgment of dubious value against Systems.

That poses a question of statutory interpretation of what constitutes "public work" for purposes of the Bond Act -- whether

that concept does or does not encompass the Systems Contract. Because there is not and could not be a dispute about the "public" nature of the Project, the real focus is on whether the substance of the Project is the kind of "work" envisioned by the statute (see Russell G. Donaldson, Annotation, <u>What Constitutes "Public Work" within Statute Relating to Contractor's Bond</u>, 48 A.L.R.4th 1170, 1178 (1986)("Donaldson")).[4] As for the statutory language itself, which is of course "the best indication of legislative intent" (<u>MQ Constr. Co. v. Intercargo Ins. Co.</u>, 318 Ill.App.3d 673, 681, 742 N.E.2d 820, 825 (1st Dist. 2000)), it provides no definition of "public work." But some context is provided by Bond Act § 0.01, which titles the statute as "the Public <u>Construction</u> Bond Act"(emphasis added), confirming that "construction" in some sense must be involved.[5]

<u>Chemco</u> is the only Illinois case that the parties and this Court have found that has dealt with the question whether the

---

[4] <u>Green Elec. Sys., Inc. v. Metro. Airports Comm'n</u>, 486 N.W.2d 819, 822 (Minn. Ct. App. 1992), cited by Safari, is an example of a decision resting on whether the relevant project was "public" under a "public work" bond statute. No issue was raised by the litigants in that case as to whether the work involved -- the design and construction of "advertising display fixtures," including the installation and repair of electrical wiring (<u>id.</u> at 821) -- was "work" covered by the statute. That decision is therefore not helpful on the question at hand here.

[5]This Court of course acknowledges the principle that statutory captions are not part of the General Assembly's enactments (see, e.g., <u>Hanover Ins. Co. v. Bd. of Educ.</u>, 240 Ill.App.3d 173, 175, 608 N.E. 2d 183, 185 (1st Dist. 1992) and cases cited there), but the just-quoted title for the Bond Act is set out within the statute itself.

subject matter of a public contract was the kind of "work" covered by the Bond Act. There the court held that a contract to supply paint to the Illinois Department of Transportation was merely a contract "to supply the State with a commodity, not 'for public work'"(303 Ill.App.3d at 902, 708 N.E.2d at 1226). Because the customized design and the extensive on-site labor that were also involved in the Installation Project do not correspond directly to the "commodity" nature of cans of paint, Chemco is not wholly analogous to this case.  Nonetheless the reasoning in Chemco provides significant guidance.

    Chemco, id.at 902-03, 708 N.E.2d at 1226-27 found a useful parallel to the Bond Act's use of "public work" in the Illinois Mechanics Lien Act ("Lien Act," 770 ILCS 60/0.01 to 60/39),[6] which employs the term "public improvement" (Lien Act §23).  Many Illinois cases have recognized the similar purposes of the Lien Act and the Bond Act: in each instance to provide some assurance of payment for subcontractors (see, e.g., MQ Constr., 318 Ill.App.3d at 681, 742 N.E.2d at 825).  Indeed, those state court cases have found that the specific purpose of the Bond Act is to provide an alternative remedy to ensure compensation for subcontractors who cannot obtain a mechanics lien on the public property involved in their work (id.; see also Carroll Seating Co. v. Verdico, Nos. 1-04-3026 and 1-04-3457, 2006 WL 3754814, at

---

    [6]   Citations to that statute will take the form "Lien Act §--," omitting the prefatory "770 ILCS 60/."

*1-2 (1st Dist. Dec. 21, 2006)).  This Court's reference to the Lien Act and its caselaw for assistance in interpreting the Bond Act is equally appropriate.

Lien Act §23 provides subcontractors a lien against certain public funds in contracts with public entities for "public improvement[s]."  That section's use of the term "improvement" clearly relates back to the definition of "improve" in Lien Act §1(b):

> As used in subsection (a) of this Section, "improve" means to furnish labor, services, material, fixtures, apparatus or machinery, forms or form work in the process of construction where cement, concrete or like material is used for the purpose of or in the building, altering, repairing or ornamenting any house or other building, walk or sidewalk, whether the walk or sidewalk is on the land or bordering thereon, driveway, fence or improvement or appurtenances to the lot or tract of land or connected therewith, and upon, over or under a sidewalk, street or alley adjoining; . . ..[7]

As that language makes plain, the central inquiry for mechanics lien purposes is whether the work improved the land or structures thereon -- that is, "whether the work performed has enhanced the value of the land" (First Bank of Roscoe v. Rinaldi, 262 Ill.App.3d 179, 183, 634 N.E.2d 1204, 1208 (2d Dist. 1994))[8].

---

[7] That definition goes on to provide more specific examples of work that is included within the term "improve" (such as landscaping and drilling water wells) that cast no light either way on the issue before this Court.  What is additionally significant, however, is that Lien Act §1(a) provides for the traditional mechanics lien on private improvements -- in contrast to the public improvements covered in Lien Act §23.

[8] That case, like other cases cited in this discussion, deals with an earlier version of the Lien Act, but the later amendments do not alter the analysis.

-10-

When the work involved (as here) is the installation of equipment in a building, the resolution of that inquiry depends on whether the equipment has become a permanent fixture to the building (and so enhances the ongoing value of the real estate, thus triggering the imposition of a lien) or whether it remains a trade fixture after installation (and so does not give rise to a lien) -- see, e.g., Airtite v. DPR Ltd. P'ship, 265 Ill.App.3d 214, 221, 638 N.E.2d 241, 245-46 (4th Dist. 1994).

To that end the Illinois caselaw teaches (id.):

The following three-part test is applied to determine whether an item is a trade fixture: (1) the means by which the fixture is annexed to the building; (2) whether the item is adapted to and necessary for a particular purpose for which the property is devoted; and (3) whether the party having an interest in the premises intended the item to become a permanent part of the property.

Other cases have instructed that the intent of the parties is the real heart of the matter, with the first two factors serving largely to provide some indicia of that intent (see, e.g., Crane Erectors & Riggers, Inc. v. LaSalle Nat'l Bank, 125 Ill.App.3d 658, 662, 466 N.E.2d 397, 400 (2d Dist. 1984)).

In sum, "public improvement" in the Lien Act does not equate to "improvement for the public." By parity of reasoning, "public works" in the Bond Act does not equate to "work for the public," as Safari would essentially argue. Instead "public work" must be viewed as a unitary term embodying the same distinction.

In that regard it ha already been said that the litigants have located only one Illinois case -- Chemco -- that addresses

the meaning of that term in the sense relevant here.  But this
Court's quick resort to the most conventional sources for
ascertaining the normal meaning of words -- the dictionaries --
has driven still another (and pretty much conclusive) nail into
Safari's semantic coffin.  Here is what <u>Black's Law Dictionary</u>
1639 (8th ed. 2004) has to say on the subject:

> Public works -  Structures (such as roads or dams) built by
> the government for public use and paid for by public funds.

And to the identical effect, here is Webster's Third New Int'l
Diction 1836 (1986):

> Public Works - fixed works (as schools, highways, docks)
> constructed for public use or enjoyment esp. when financed
> and owned by the government; specif: government sponsored
> public improvements (as parks or playgrounds) as
> distinguished from work of a routine nature such as the
> grading and lighting of streets.

There is really no room for arguing ambiguity in the face of such
express and unequivocal confirmations of the plain meaning of the
critical language.

In the terms thus deemed relevant by every reliable source,
whatever labor was involved in the Installation Project did not
transmute the installed equipment into a permanent fixture, such
as to amount to an improvement to the land.  What was used to
attach the actual hardware involved to the respective buildings
were no more than patch cords plugged into servers and cords
leading to power sources (S. St. ¶¶33, 46).  And to store and
organize that hardware, several large racks were supplied,
assembled and bolted to the ground for safety (the hardware was

also secured to those racks)(id., ¶¶51-57). Although it would no doubt require trained technicians to accomplish the removal of that equipment (id. ¶30), all of it could be removed without any material damage to the freehold.

As to the second factor, while the equipment was to some extent custom designed and programmed for Board's communication infrastructure and educational purposes (see, e.g., S. St. ¶¶21-23), it certainly cannot be said that it was an essential improvement to the buildings to make them suitable for use as educational and administrative facilities. Installation of that equipment simply did not have the same effect on the ongoing character of the property as, for example, the installation of stoves and walk-in coolers did in the retrofit of a building into a restaurant, where a new owner understandably continued to use the installation post-sale (see B. Kreisman & Co. v. First Arlington Nat'l Bank, 91 Ill.App.3d 847, 852-53, 415 N.E.2d 1070, 1074-75 (2d Dist. 1980)).

Neither of those factors, however compelling, would alone preclude a possible finding that the installed equipment had become permanent fixtures if there were countervailing evidence that Board intended the equipment to become a permanent part of its buildings (see Crane Erectors, 125 Ill.App.3d at 662, 466 N.E.2d at 400). But Safari has pointed to no such evidence here. To the contrary, it would be entirely counterintuitive to infer that if Board were to move its Central Office or one of its

-13-

schools, it would leave the equipment behind in the old property, where by definition it would serve little benefit to a new owner who was not connected to Board's Network and would consequently have little impact on the sale price of the real estate. Given the far greater equipment cost than the labor costs involved in the Systems Contract (S. St. ¶15), the obvious incentive would call for Board to unscrew the bolts, unplug the cables and take the hardware to the new location, rather than to buy it all anew.

Accordingly, while Board may obtain great value and benefit for its <u>educational mission</u> from the Installation Project, it cannot be said that the intent of the Systems Contract was to enhance the value of Board's <u>real property</u>. As <u>B. Kreisman</u>, 91 Ill.App.3d at 852-53, 415 N.E.2d at 1074 has put it:

> In considering the third factor [that of intent], we note that it is the intent to permanently improve the real estate, not simply the intent to use the equipment in the business carried on in it, which is relevant to the question of lienability.

In short, considering all the facts in the light most favorable to Safari, the installation of the equipment under the Systems Contract does not qualify as the type of work that the General Assembly envisioned as a "public improvement" under the Lien Act or, by analogy, as a "public work" under the Bond Act.[9]

---

[9] <u>Henry DeCicco & Co. v. Drucker</u>, 101 Ill.App.2d 340, 346-47, 245 N.E.2d 456, 459-60 (1st Dist. 1968) and <u>Lyons Sav. v. Gash Assocs.</u>, 279 Ill.App.3d 742, 748, 665 N.E.2d 326, 331 (1st Dist. 1996), which respectively found that painting and the installation of miniblinds are lienable work, do not suggest (let alone call for) a different conclusion. While it is true that

Finally, a survey of other sources of law suggests the same inquiry and leads to the same conclusion. Courts have interpreted several states' statutes and the federal Miller Act-- not identical to the Illinois statute, to be sure -- that require payment bonds as part of contracts for "public work" to cover only contracts for "fixed works," "construction-oriented" projects or work "akin to building contracts" (see Donaldson, 48 A.L.R.4th at 1187-89 and cases cited there). And for workers to fall within the protection of Illinois' Prevailing Wage Act, they must be engaged in "public works," defined as "all fixed works constructed for public use by any public body" (820 ILCS 130/2; Opportunity Ctr. of Se. Ill., Inc. v. Bernardi, 204 Ill.App.3d 945, 950, 562 N.E.2d 1053, 1056 (5th Dist. 1990)). As already stated, while the work involved in the Installation Project was extensive, it did not involve a "fixed work" and in the end really was not "construction" type work, as the statutes and caselaw have continued to use that term in the brick and mortar sense.[10]

---

paint and miniblinds are relatively impermanent changes to property, such "altering, repairing or ornamenting" (Lien Act §1(b)) of property, as is clear from the inclusion of those specific terms in the statute, has the purpose of increasing the value of the real estate, even if by a small amount. That is not the situation here.

[10] Two New York cases cited by Safari give a bit of pause, but neither calls for any different conclusion. Both Twin State CCS Corp. v. Roberts, 72 N.Y.2d 897, 899,(N.Y. Sup. Ct. 1988) and a nisi prius court decision in Joint Indus. Bd. of the Elec. Indus. v. Koch, 452 N.Y.S.2d 488, 490 (N.Y. Sup. Ct. 1982) found the installation of telecommunications equipment to be "public

Although A.E.I. Music Network, 290 F.3d at 953 also involved a contract for the installation of an audiovisual system in a public school, it has already been said that it is inapposite because the decision there focused on a quite different provision of the Bond Act, with no discussion (let alone any decision) as to whether the work involved was indeed "public work" covered by the statute. Nor does the opinion provide any insight into the actual work carried out there, as compared to the situation in the case at hand.

In summary, the strong weight of analogous authority compels the conclusion that the work required under the Systems Contract, including that performed by Safari, was not "public work" within the meaning of the Bond Act. That being so, Board was not required to obtain a payment bond from Systems for the benefit of Safari, and Safari's claim must fail.

## Conclusion

There is no genuine issue of material fact that, if resolved in Safari's favor, could bring it within the protection of the Bond Act. Consequently Safari cannot make a claim for breach of contract or otherwise against Board. And that in turn renders it

---

work" under that state's prevailing wage act. Both those decisions, however, rested on facts that established that, as the latter case (id.) put it: "it [was] clear that extensive construction-type labor is involved in the installation of what [one witness] refers to as 'a permanent improvement to the structure.'" And that is in total contrast to the evidence Safari has been able to point to here.

unnecessary to address other issues raised in the parties'
briefs.  Board's motion for summary judgment is granted, Safari's
is denied and this action is dismissed as against Board.[11]

_____
 Milton I. Shadur
 Senior United States District Judge

February 21, 2007

---

 [11]Because Safari's claim against Systems has previously been
reduced to judgment, this is a final order.